IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROL D'AMICO, Administratrix of the Estate of FRANCES CHAIRIERI | : : : | CIVIL ACTION |
| v. | : : | |
| GARLOCK SEALING TECHNOLOGIES, LLC, et al. | : : | NO. 92-5544 |

O'NEILL, J.                                                          SEPTEMBER 13, 2007

MEMORANDUM

On September 23, 1992, plaintiff's estate filed a complaint alleging plaintiff's decedent, Alfred Chairieri, developed and died from mesothelioma as a result of exposure to asbestos from the products of defendant Garlock Sealing Technologies, LLC and eleven other companies. Before me now are defendant Garlock's motion for summary judgment, plaintiff's response, and defendant's reply thereto.

BACKGROUND

Plaintiff's decedent Alfred Chairieri was diagnosed with mesothelioma on November 8, 1990 and passed away on February 1, 1991. Plaintiff alleges that Mr. Chairieri developed mesothelioma as a result of exposure to asbestos from defendant Garlock's products while he worked as a welding inspector for Conrail and its predecessors from 1941 through 1981. To support this allegation, plaintiff submits deposition testimony from two of decedent's co-workers, Edward Burger and Angelo Balestino.

Edward Burger worked as a boilermaker and performed heavy repairs on locomotives in the same shop as decedent, in and around the same areas as decedent, from 1975 to 1977. In his

1

deposition, Burger recalled that decedent was present when Garlock products containing asbestos were used at those locations:

> Q. Okay. As a boilermaker from 1975 to 1977, did you work with any products which you believed to have contained asbestos?
> A. Yes.
> Q. Okay. What type of materials did you work with that you believed contained asbestos?
> A. Garlock.
> Q. Okay, Garlock, what? What type of materials were they?
> A. They were gaskets, pipe insulation.

Burger testified that he would see quite often boxes of pipe insulation bearing the name Garlock and specifically described both the boxes and the insulation:

> Q. Now, the pipe wrap itself, how did you know that was manufactured by Garlock?
> A. I've seen them take it...put insulation on the locomotive with that.
> Q. And how did you know that insulation was manufactured by Garlock?
> A. It said it on the box.
> Q. Okay, why don't you describe the box for me?
> A. It was a pretty good size box.
> Q. Okay. How long was the box?
> A. Oh boy, you're getting into measurements again.
> Q. I'm trying.
> A. I don't know. I'd say it was about this big.
> Q. About three foot?
> A. Yeah.
> Q. And how wide would the box be?
> A. Maybe two foot wide.
> Q. And what was written on this box?
> A. It has Garlock.
> Q. Okay. And what color was the box?
> A. Well, if I can recall right, it was...it was brown, but it had an emblem or a Garlock insignia on it.
> Q. Okay. What did this insignia, Garlock insignia look like?
> A. You're getting me...I can't...I'm not sure. All I know it was Garlock.
> Q. And what color letting was either the insignia or the word Garlock?
> A. I'm not sure, it might have been yellow. Don't quote me to that though.
> Q. You already have been.
> A. I was afraid of that.
> [Q.] What style of printing was it? Was it script, block or something else, do you

2

| | | |
|---|---|---|
| | | recall? |
| A. | | I don't recall. |
| Q. | | And was there anything else written on the box besides the word Garlock and it's [sic] insignia? |
| A. | | Pipe insulation, I think. |

. . . .

| | | |
|---|---|---|
| Q. | | Okay. Where....we may be confusing each other. You said that the pipe wrap came in a three foot long box that was two foot wide and it pulled out something. I'm just trying to find out what came out of the box. Now what they did with it later, just when they pulled it out of the box, what did this look like? |
| A. | | It looked like pipe insulation. |
| Q. | | Was it round, was it square? |
| A. | | It was round. |
| Q. | | Okay. Was it commonly referred to like a half moon? |
| A. | | Yes. |
| Q. | | And did it come in one piece or two piece per box? |
| A. | | Two piece. |
| Q. | | And that was simply white at that time? |
| A. | | Yes. |
| Q. | | How did you know that this insulation itself contained asbestos? |
| A. | | It said on the box, asbestos. |
| Q. | | And how often did you see boxes of Garlock pipe wrap? |
| A. | | Quite often down there. |
| Q. | | Did you ever see any other manufacturer of pipe wrap other than Garlock? |
| A. | | Yeah, there was other ones there, but I couldn't tell you what name. This Garlock just happened to stick in my mind for some reason. |

Burger also testified that he specifically recalled decedent's presence while this pipe insulation was placed on the stacks and then ripped off the stacks, and stated that decedent would be exposed to the dust and that he was "there a lot" – specifically, more than a dozen times – during the removal process.

With respect to gaskets, Burger was not able to recall seeing anyone install a gasket manufactured by Garlock. Indeed, Burger testified that he did not know but only assumed that any gasketing material was manufactured by Garlock:

3

> Q. And the gasketing material that you had seen, how did you know that any of it was manufactured by Garlock?
> A. I didn't.
> Q. You don't know that the gaskets...
> A. I don't know that the gaskets was, but I assumed that they was.
> Q. Do you have any personal....do you know if Garlock made gaskets that were ever used at the Juniata Park facility?
> A. I would say yes.
> Q. Why would you say yes?
> A. Because I seen boxes or....pamphlets....cardboard pamphlets or whatever it was, with their name on it.
> Q. You've just seen pamphlets referring to gaskets?
> A. No, no, no, the package itself.
> Q. Did you ever see anyone personally install a gasket manufactured by Garlock?
> A. I couldn't say that I did.

Angelo Balestino worked as a car repairman and welder at Conrail's Hollidaysburg Car Shop from 1966 to 1982. In this capacity, Balestino worked on passenger cars, freight cars and box cars. In his deposition, Balestino associated the name Garlock with fittings and gaskets but not pipe insulation:

> A. I remember the name, Garlock.
> Q. Okay. And do you associate that....do you remember working with any of those products at that time?
> A. I remember working with some of those products.
> Q. Okay. What products were they?
> A. They were fittings and gaskets and...
> Q. Okay. You also discussed insulation for passenger cars. And you also mentioned something about fiberglass. Do you know if that material that you discussed contained asbestos?
> A. Well, all insulation...the insulation they used in the passenger cars contained...it contained some asbestos. I can't remember exactly the name of the product, but the insulation did contain asbestos.
> Q. The insulation that we're discussing right now, do you remember who manufactured it?
> A. Mansville was one of them. John Mansville.
> Q. Do you remember any other manufacturers?
> A. And I believe Carey. Offhand I can't....there's several of them. Offhand, I can't remember them all.

Later in his deposition, Balestino could not recall specifically working with any Garlock

products during the removal process and could only state that the name sounded familiar:

> Q. Okay. At this time, and I'm limiting it to the removal process that you've just described. I'm going to give you several names and see if you recall working with any of these products and you can tell me whether you do or not. Did you work with any Garlock products during the removal process?
> A. The name sounds familiar, I'm not....Garlock was...I think they made gaskets and fittings, some type of fitting, and I don't know about insulation.
> Q. Okay. How do you remember seeing the name Garlock? Where was it from? Do you recall where you saw it?
> A. Well, naturally when....when you got a product and put it on, there would be boxes laying around, whatever it was. The storehouse would bring the product there and you would put it on, the part, whatever it was, and the name would be on there. That's how you got to know the names.

Balestino subsequently stated that he never saw decedent personally use gaskets at any time and that he did not have a specific recollection of decedent being present in the area when he was using gaskets:

> Q. Gaskets. Did you ever see Mr. Chairieri personally use gaskets at any time?
> A. I'd have to say I've never seen him personally use gaskets.
> Q. And do you have a specific recollection of Mr. Chairieri being in the area when you were using gaskets?
> A. I can't say that.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(e) provides that when a properly supported motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

56(e).

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. Id. at 322-23. If the moving party sustains the burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 255. In addition, the "existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of credibility against'" the moving party. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978), quoting Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 878 (3d Cir. 1972).

## DISCUSSION

I.    Product Identification

In asbestos litigation under Pennsylvania law, plaintiff must present evidence that he inhaled asbestos fibers shed by the specific defendant's product. Wilson v. A.P. Green Indus., Inc., 807 A.2d 922, 924 (Pa. Super. Ct. 2002), citing Eckenrod v. GAF Corp., 544 A.2d 50, 52 (Pa. Super. Ct. 1988). "Ideally, a plaintiff . . . will be able to directly testify that plaintiff breathed in asbestos fibers and that those fibers came from defendant's product." Wilson, 807 A.2d at 924. "Without such direct evidence, plaintiff must rely on circumstantial evidence of exposure; specifically, plaintiff must meet [the test established by Eckenrod]. Gilbert v. Monsey

Prods. Co., 861 A.2d 275, 276 (Pa. Super. Ct. 2004).  Under the Eckenrod test, plaintiff's evidence of exposure must show that he "worked, on a regular basis, in physical proximity with the product, and that his contact with it was of such a nature as to raise a reasonable inference that he inhaled asbestos fibers that emanated from it."  Coward v. Owens-Corning Fiberglass Corp., 729 A.2d 614, 622 (Pa. Super. Ct. 1999), citing Eckenrod, 544 A.2d at 53.

In Eckenrod, the Pennsylvania Superior Court affirmed a grant of summary judgment in favor of defendant asbestos manufacturers because plaintiff failed to provide sufficient evidence of decedent's exposure to defendants' products.  544 A.2d at 52.  Although plaintiff presented evidence that defendants' asbestos-containing products were sent to the furnace area of plaintiff's employer and that plaintiff worked somewhere in the vicinity of those products, the Court concluded that the evidence was insufficient because it "did not elaborate on the nature or length of the exposure or the brand of products available."  Id.  With respect to the products of a defendant in Robertson v. Allied Signal, Inc., the Court of Appeals similarly found that "testimony [was] insufficient to establish the specific regular use of these products required by Eckenrod.  While several witnesses were able to place [defendant's] products in the plant, no witness was able to say how much of the product was used and how many times it was used in a given area."  914 F.2d 360, 378 (3d Cir. 1990), quoted in Rotondo v. Keene Corp., 956 F.2d 436, 440 (3d Cir. 1992).  The Court of Appeals concluded that the Eckenrod standard had not been met because plaintiffs had submitted no evidence "that any plaintiff was exposed to or worked in the vicinity of any [defendant] product on a regular basis."  Id., quoted in Rotondo, 956 F.2d at 440.

As direct evidence is unavailable in this case, plaintiff must rely on circumstantial

evidence of decedent's exposure to asbestos from defendant Garlock's products. Plaintiff's evidence regarding exposure to defendant's products therefore must satisfy the requirements of frequency, regularity and proximity set forth in Eckenrod.

In its motion for summary judgment, defendant Garlock contends that the only witness to identify Garlock as a manufacturer of a product allegedly exposed to plaintiff's decedent was Edward Burger. Defendant argues that Burger's testimony does not adequately identify Garlock as the manufacturer of the gaskets with which decedent worked. Defendant, relying on an affidavit of James E. Heffron, Garlock's senior marketing manager, further asserts that Garlock never manufactured, rebranded, licensed, designed or sold pipe insulation fitting Burger's description.

Plaintiff's response first notes that defendant's motion fails to address Angelo Balestino's deposition and argues that Balestino's testimony sufficiently indicates that decedent was exposed to asbestos fibers shed from Garlock's gaskets. I find that Balestino's testimony does not demonstrate that decedent was exposed to or worked in the vicinity of Garlock's products on a regular basis while he performed work on passenger cars, freight cars and box cars. Though Balestino recognized the name Garlock and associated it with fitting and gaskets, he expressly stated that he never saw decedent personally use gaskets. Balestino also had no specific recollection of decedent being in the area when he was using gaskets. As plaintiff points out, Balestino testified that decedent was present while pipe insulation was repaired, torn down and replaced. However, Balestino did not know whether Garlock made pipe insulation, and when asked to recall insulation manufacturers' names, Balestino recalled John Mansville and Carey, but not Garlock.

Though Balestino's testimony does not satisfy the Eckenrod requirements, I will not grant summary judgment based on insufficient product identification because the deposition testimony of Edward Burger regarding pipe insulation raises a reasonable inference that decedent was exposed to asbestos dust shed from a product of defendant Garlock while he worked on locomotives.  Burger testified that pipe insulation with which he worked came from boxes labeled Garlock.  Burger also stated that he saw these boxes quite often, specifically recalled decedent's presence while pipe insulation was placed on the stacks and then ripped off the stacks, and witnessed decedent's exposure to the dust more than a dozen times during the insulation removal process.  Because I must resolve all inferences, doubts and issues of credibility against the moving party Garlock, I cannot grant summary judgment based on the assertions in Heffron's affidavit.  Due to Burger's testimony regarding pipe insulation, there is a genuine issue of material fact as to whether plaintiff can meet the Eckenrod standard.

II.     Boiler Inspection Act

Defendant alternatively argues that plaintiff's state common-law tort claims are preempted by the Boiler Inspection Act, 49 U.S.C. §§ 20701 et seq.  Defendant contends that the BIA occupies the field of locomotive equipment and thus preempts any state action affecting the design, construction and material of locomotive parts including plaintiff's claims, which arise out of decedent's installation and removal of component parts to a locomotive.

The Supremacy Clause states that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, and Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. Art. IV, cl. 2. "[W]here a state statute conflicts with or frustrates federal law, the former must give way."  CSX

Transp. Inc. v. Easterwood, 507 U.S. 658, 663 (1993). Further, because a damages award can act as a "potent method of governing conduct and controlling policy," federal statutes that occupy a field – like the BIA in the field of locomotive safety – serve to preempt both state statutory enactments and state common-law tort remedies. San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 247 (1959).

The BIA provides, in relevant part: "A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances – (1) are in proper condition and safe to operate without unnecessary danger of personal injury . . . ." 49 U.S.C. § 20701. In Napier v. Atlantic Coast Line Railroad Co., the United States Supreme Court held that Congress, through the BIA, intended to occupy the field of locomotive equipment. 272 U.S. 605, 611 (1926) (defining the occupied field as "the equipment of locomotives"). The Court accordingly held that the BIA preempts any state action that would affect "the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." Id.

Because plaintiff's state common-law tort claims are based on the material of locomotive parts allegedly manufactured by Garlock, the BIA preempts her claims. The Supremacy Clause prohibits a damages award in this case, as such an award would allow states to govern conduct and control policy in the area of locomotive equipment, a field occupied by Congress through the BIA.

Arguing against preemption, plaintiff asserts that the Boiler Inspection Act applies only to railroad carriers and not to manufacturers and distributors of asbestos products like Garlock. Plaintiff relies on Lorincie v. Southeastern Pennsylvania Transportation Authority for the

proposition that the BIA applies only to railroad carriers and not to railroad manufacturers that are not also carriers.  34 F. Supp. 2d 929, 933 (E.D. Pa. 1998).  This Court in Lorincie stated that "it is clear that the BIA as a whole establishes a regulatory framework within which carriers and the Secretary of Transportation – but not railroad manufacturers – operate.  Nothing about the structure of the BIA indicates that Congress intended to bring railroad manufacturers within its regulatory web, let alone preclude state common law actions against railroad manufacturers." Id. at 934.

While the BIA does not specifically address "railroad manufacturers," the majority of courts that have addressed the issue have held that the BIA preempts state common-law tort actions against railroad manufacturers for claims relating to the design, construction and material of locomotive parts.  See, e.g., Oglesby v. Del. & Hudson Ry. Co., 180 F.3d 458, 462 (2d Cir. 1999) (holding that the BIA preempted a state common-law tort action against a manufacturer of locomotive seat cabs); Law v. Gen. Motors Corp., 114 F.3d 908, 912 (9th Cir. 1997) ("Imposing tort liability on railroad equipment manufacturers would [affect the design, the construction, and the material of every part of the locomotive] by forcing them to conform to design and construction standards imposed by the states.").  These courts follow the Supreme Court's assertion in Napier that the preempted field is determined by its subject and in the context of the BIA that subject is "the equipment of locomotives."  272 U.S. at 613.

I agree with the majority of courts and conclude that the preempted field of locomotive equipment extends to actions against railroad manufacturers.  "Although the word 'manufacturer' does not appear in the BIA, the scope of the Act includes both the 'design' and 'construction' of a locomotive's parts." Oglesby, 180 F.3d at 462, citing Napier, 272 U.S. at 611.  As the Court

11

stated in Oglesby, "[w]here, as here, the design and construction of a part are in the hands of a manufacturer, the results that Congress had hoped to obtain through the BIA would be accomplished best by including the manufacturer within the statute's coverage." Id. Forcing railroad manufacturers to conform to state design and construction standards naturally would impinge on the field of locomotive equipment that Congress occupied through the BIA. Moreover, imposing standards on railroad manufacturers would effectuate an imposition of those standards on railroad carriers.

Plaintiff contends that the Boiler Inspection Act does not preempt plaintiff's state law claim for two additional reasons. Plaintiff argues that the BIA applies only to locomotives which are "in use" in interstate commerce and not to locomotives in a car shop for repairs such as those at decedent's workplaces. Though, "[a]s a threshold matter, liability will only exist under the BIA where the locomotive in question is 'in use' at the time of the accident," Crockett v. Long Island R.R., 65 F.3d 274, 277 (2d Cir. 1995), plaintiff is not seeking relief pursuant to the BIA or any other federal statute in this case. Because the BIA preempts the entire field of locomotive equipment, the question of whether decedent was exposed to asbestos from locomotives in use or not in use is irrelevant to my determination that plaintiff's state common-law tort claims are preempted.

Finally, plaintiff argues the BIA does not apply to decedent's work as recounted by Angelo Balestino, as Balestino worked with decedent on passenger cars, freight cars and box cars and the BIA applies only to locomotives. However, plaintiff's argument is premised on a finding that Balestino's testimony satisfies the requirements of Eckenrod. As stated above, Balestino's testimony regarding decedent's exposure to Garlock's products while working on passenger cars,

freight cars and box cars does not satisfy the <u>Eckenrod</u> requirements. Therefore, even if the BIA does not apply to the testimony of Balestino, I would still grant summary judgment based on the insufficiency of that testimony.

      An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROL D'AMICO, Administratrix of the Estate of FRANCES CHAIRIERI | : : : | CIVIL ACTION |
| v. | : : | |
| GARLOCK SEALING TECHNOLOGIES, LLC, et al. | : : | NO. 92-5544 |

## **ORDER**

AND NOW, this 13th day of September 2007, upon consideration of defendant Garlock's motion for summary judgment and plaintiff's response thereto, and for the reasons stated in the accompanying memorandum, it is hereby ORDERED that defendant's motion is GRANTED, and judgment is entered in favor of defendant Garlock and against plaintiff.

                                             s/Thomas N. O'Neill, Jr.
                                             THOMAS N. O'NEILL, JR., J.